We'll hear argument this morning in Case 11-161, Armour v. City of Indianapolis. Mr. Stancil. Mr. Chief Justice, and may it please the Court, the City chose a method for abandoning its sewer funding mechanism that left petitioners paying 30 times more than their next-door neighbors to connect to their neighborhood sewer project simply because petitioners had paid their tax bills in full. Mere timing of payment does not render similarly situated taxpayers into separate groups. And that is particularly true here, where the taxpayers are a discreetly defined group of homeowners sharing equally in a common, specific benefit, and State law explicitly defines them as similarly situated. The City's principal contention is that jettisoning the Barrett Law, the way they funded the initial taxation, was itself an end for this justification and itself justified the gross disparity imposed on petitioners. That does not. The fact that an arbitrary classification may yield a desirable result does not render it any less arbitrary. The City must have a reason for drawing the distinction, but paying one's taxes in good faith does not eliminate a taxpayer's right to equal treatment. Indeed, State law here makes clear that delaying payment by choosing an installment plan does not put a taxpayer on special footing. For example, the Barrett Law declares that installment payments, quote, shall be collected in the same manner as other taxes, and installment payments are automatically secured by a lien against the property. Taxpayers who select the installment plan, which they may do for any reason or no reason whatsoever, and in fact, if they make no choice, they default into the installment plan, they are required, if the City asks, as it did here, to sign an agreement agreeing to pay the installments in full, with interest, and not to contest the validity of the underlying assessment. Sotomayor, I understand your arguments. Your adversary raises a point that concerns me, which is what happens to all other amnesty programs, like parking ticket amnesties? And if you take your logic to an extreme, how about something that doesn't involve money, but immigration status amnesty? Illegal aliens who can apply for citizenship and be forgiven their illegal entry. Doesn't the logic of your theory basically mean that there are no circumstances in which the government could treat people differently? No, Your Honor, for several reasons. For starters, this Court's equal protection and rational basis cases in particular make clear that context is key. So forgiving a penalty imposed on a speeder, for example, who has an overdue ticket or a parking ticket, is a qualitatively different judgment than forgiving the underlying tax liability of a broad crossing. Sotomayor, every time a police officer stops me for a traffic violation, I get angry when he lets somebody else go. So you are suggesting that there is a difference between that and this case, where the government is basically saying, you owe me something and I'm going to forgive you what you owe me? Yes, Your Honor. The Chief Justice's opinion in Enquist took that specific example on, not with you in mind, presumably, but took that example on specifically, and it said this is the kind of action itself that is inherently a subjective, individualized determination. It's not irrational to pull over one traffic violator and not another because that's the nature of the enforcement action. That is qualitatively different from a tax imposed on 181 homeowners who live next door to each other, and then 12 months later saying, you know, 31 of you are going to pay 30 times as much in reality as the other 150. Even though there are a lot more than 20 different lots, 20 different — I mean, what's your view of how the cutoff should work? Do they have to refund all the money to everybody who, in fact, ever paid a Barrett law assessment? No, Your Honor. And State law on this is quite different. I don't care what the State law is. I'm saying a matter of constitutional law. Well, constitutional law looks to State law. That's what we took out of Allegheny, Pittsburgh. Okay. All right. So what? But I'll back up. I'll do it both ways, Your Honor. State law itself says the following taxpayers are similarly situated, your project specific to your neighborhood, because those are the people to whom you're guaranteed — with whom you're guaranteed equal treatment. It isn't that you're entitled to a certain price for a sewer connection under this law. It's — Well, why can the State, when they have, let's say, 10,000 people who have already paid their assessments, well, why doesn't it have to give them back their money on your theory? That's my simple question. Because they're not similarly situated. Why aren't they? Because your State — the States have flexibility to define at the outset who is similarly situated. Okay, fine. They define here who is similarly situated, and the people who aren't are the ones who are on the installment plan. No, Your Honor. But they still have to have a basis for saying that. They don't have to. They do. The reason is because they think it's unfair to give the people — they think it's — they don't want to bother collecting it from these people who haven't paid yet. Okay? That's why. And they don't see a way, if you — so if we're going to free them, we don't want to go back into history and then suddenly give back all the people who've ever paid their assessment. I mean, so we draw the line somewhere. Your Honor — This is where we're drawing it. That's the State law. What's wrong with that? That's not what this Court's cases say. It's not the fact that you need to draw a line somewhere. I'll take the case that Respondents rely on heavily, FCC v. VA. I mean, my point I'm not making clear. My point is that what's less rational about saying if you paid too bad, we're having an amnesty for the future? What's less rational about doing that than saying some of the people who paid in full will get their money back and some will not, which is the line you want to draw? No, Your Honor. Let me — I'll back up again. So we do have a specific definition of who is and who is not entitled to equal treatment or roughly equal treatment. So that's under State law. So they've already committed to who is and who is not similarly situated. So all you need to decide in this case, and this is brought as an as-applied challenge by these homeowners, is are these people who are promised you will pay the very same as your next-door neighbor for this pipe that you're going to flush your toilet into, are they allowed to then change their mind and say, actually, you're going to pay 30 times as much? Mr. Stancil, who are these people? We have the plaintiffs in this suit and there's a judgment, there was a judgment in the court of first instance, in the appellate court, for a dollar amount. But we're told that there are many more of these Barrett law projects and that they all operate the same way. So the result is a lot more money than these plaintiffs are claiming. Is that not so, if your position on the law is right? If we are correct, the city will end up paying a little more than in our specific case, but I'd like to explain why and how much, because it's an important distinction. There are about 21 Barrett law projects that still have balances outstanding. Many of them are almost paid off. So there are only three that have the 30-year option. The rest have the 10-year option, anything from 2001 prior. So, in fact, I think I can give you specific numbers. There are seven projects that are less than, that are half paid off or about less than, or less than half paid off. Because the equal protection violation is only triggered by gross disparity between equally similarly situated taxpayers, the city may or may not have to refund in each project down the line. If you're in year 9 of 10 of repayment, that's not a gross disparity. If you're in year 9 of 10, I don't think that counts as a gross disparity. What does is my question. How do you separate a gross disparity from a non-gross disparity? Well, start with this case, which is easy. It's 10 to 1 and 30 to 1. It's the same number as in Allegheny-Pittsburgh. But even if you drew 4 to 1 or 5 to 1 as a line, as the Court has done, say, in punitive damages cases where it's suggested outer limits, that — I think those are easy lines to draw and certainly lines that the lower courts draw. If you win, does the city just have to give you enough to bring it down to 5 to 1 so that it's no longer a gross disparity? I don't think so, Your Honor. I think triggering the gross disparity triggers the violation. And the question is, well, what's the remedy for a violation? I think they'd have to have a reason for saying we're going to — it would be the very definition of arbitrary to say, well, even though you're entitled to equal treatment as a matter of law, you know, and even though we're not — it's not — liability isn't triggered except for gross disparities. I think they would have to give us that figure. And, Your Honor, if I could, I'd like to get back, Justice Ginsburg, to your question about how these other projects. There's a suggestion by Respondents that there's a terrible line-drawing problem, and how do we calculate these benefits? It's simply not the case. We have this Federal class action in the Cox case, which is every other Barrett law project, it's active except ours. We opted out. The damages question was before that court, because the court ruled in favor of the position that this is an equal protection violation. The city put together a damages pleading, and it produced, to the dollar, the calculation of every overpayment in every Barrett law project. Breyer, that isn't the administrative — well, maybe that's one of them. The administrative problem is, I thought, the following. Imagine that you are the city mayor. All right? And suppose the mayor does what you want. The mayor says, I'll give all these people in their project back their money. The next day in my office, there show up 15 people who say, last month we happened to be in project 2, and we paid all our money. Why don't you give us back our money? You just gave it to the people on project 1. Give it to us. And the next day after that, there are 14 people from project 3 and from project 4. What is your answer to those angry taxpayers who have said, we don't understand why you refunded the money from project 1, but not for us? What's your answer? Two reasons. One, you were not promised equal treatment under State law to those other projects. You were promised equal treatment with the people you live next door. Two, you use a different pipe. These pipes cost different amounts of money to put in different places, and they are done over time. Your Honor's hypothetical, actually, if I could tweak it a little bit, the question is not who comes in for somebody — who comes in from a project last month. The only question is who comes in from a project 11 or more years ago, because those are the only ones that will still be in repayment. The Cox — if we win, well, there's a repayment plan. That's the only thing that creates this asymmetry. The only people who are going to come in and say, well, you refunded some people in my project, but not me, are people in repayment. So it's only going to be from a project 95. You see, the problem that I have is that you're trying to lop off half of the project, which is what was the Barrett project, without looking at what the new project is. And that goes to what Justice Breyer's point was. Moving forward, every old project and every new project is going to pay more money than they did under the Barrett law, because I think, if I understand correctly, the city is raising a — essentially not a flat fee, but a fee — assessing a flat fee across all taxpayers so that the sewer lines could be built. Am I correct about that? No, Your Honor. For future sewer projects that they start, each person who connects to that new pipe pays a $2,500 flat fee. Every resident citywide who uses the municipal sewer, new, old, or whatever, pays an extra about $10 a month under the new system. So what they did, they decided this program, the Barrett law, is politically very unpopular. We would like to get rid of it. Fair enough. But they chose a way to do it. They said, well, we're going to be completely ignorant of the effect. But it says that new people are going to pay a flat fee. Old people are going to pay $10 more a month that they didn't have to pay. Right. And so why can't they come in, and why don't they come in and say exactly what Justice Breyer said? You forgave the payments of taxes for hooking up to the sewer system of these new people coming in. You're treating me differently. There's nobody who will pay more under the new system than my clients, because the new people pay $2,500 and the same monthly fees that now every Indiana resident pays. Well, so everybody else says, I want to pay $2,500. You're still not dealing with the fact that this was one decision tied to others. It was a package deal. And so that the rationality of this package deal has to be seen in context. You want to lop it off and say, all I'm looking at is how much these taxpayers paid for this old system, not what the new system is creating. But that's because under this Court's equal protection cases, they have to have a reason for this particular line. They can't say we have a general objective and it doesn't matter if we pursue it or not. I might have missed a fact, which I'd like to know. Let's call your project Project 1. All right. And all the others are 2 through 20. Are there any people in Projects 2 through 20 who still have money outstanding or are they all paid off? Yes. They have — they're in various states of repayment. They're in various states. Okay. What happened to the taxpayers who still owe money in Projects 2 through 20? They all got refunded, or their balances were completely forgiven. Okay. So it's the same. So now the people for the angry taxpayers in Projects 2 through 20 show up at the mayor and say, Mayor, you not only — you not only — under your system, you not only gave the all paid-up people back if you win, but you also paid them back if you also forgave the future people in 2 through 20, and you're not giving us our money back. Let me make clear. 2 through 20 are — In the facts? I'm not sure. I want to make sure I understand that fact. 2 through 20 are actually older projects. Yes, older projects. Okay. So they owe less money. And they come into the mayor and they say, where's my money? I paid in full. I paid my 9,000. Yeah, right. But Joe over here got his last $1,000 forgiven. Yeah. Here's what the mayor says. Yeah. The mayor says, I talked to my lawyers, if it's a grossly disproportionate burden, so if you end up paying grossly disproportionately to your next-door neighbor, because that's what Allegheny-Pittsburgh and Nordlinger and all the courts' cases say, then I'm — I have to give you a refund. But if you end up paying 10 percent more than the other person to connect this pipe, that's just not enough. Oh, I see. I think — I think that Justice Breyer is suggesting that if you treat unconstitutionally a whole lot of people, you can get away with it. Well — Oddly enough, I was not suggesting that. Counsel, some — some time ago, I thought you were just about to tell us how much money the city says will be at stake if you prevail. In my case, there's $273,391.63. In the Cox case, $2,783,702.59 on the assumption that all of those people are grossly disproportionately burdened. And the city says that's the total amount that's at issue if you prevail, if the taxpayers prevail on this claim. That's what they said in Cox, yes, Your Honor. Could the city cure the problem by rescinding the forgiveness for those who paid under the installment plan? No, Your Honor. Why not? This was specifically addressed in Allegheny-Pittsburgh. That's exactly what the West Virginia Supreme Court said. They said, well, if you have any remedy, it's only to raise the taxes on other people. And this Court specifically rejected that. You wouldn't have any incentive to bring a lawsuit if that were the remedy, would you? Right. I'm already unpopular. Effectively. I'm unpopular in Indianapolis as it is. If I went back and just raised everybody's taxes, I'll never get to go. But again, and that's just the practical reality. Why isn't that a choice for the legislature? Because everybody could be treated equally by getting the money back, or nobody gets out from under the old system. So why shouldn't that be? The decision is you can't treat these two groups of people differently. So I think the Court has said in a number of cases, you can equalize up or down. That's a legislative choice. It was a legislative choice, Justice Ginsburg. But having now made a choice that inflicts a constitutional violation, this Court's cases are clear that the correct and the default rule is refunds, because for exactly the reason Justice Scalia raised, even if it's possible to go back and do that, which it isn't always the case, but even if it's possible, that just means that equal protection cases and tax cases don't get brought, because the most you can hope to get is. Mr. Stancil, if that's right, and let's take a case which is different from the one that you're saying. Let's take a case where there are many, many, many more open projects involving much, much more cost than you're saying is true here. And the mayor looks at this and says, you know what, unless I can just draw the line here, I'm not going to be able to change this financing system, either unless I can draw the line here or unless I can say, you know, nobody gets any money. What's the mayor to do? Well, again, I agree with Justice Scalia that making a big mess isn't a justification for arbitrarily ending it. Well, but I guess what I'm asking is we have this terrible program. Everybody hates it. It's not fulfilling its intended purposes. The mayor and everybody else wants to change it. How is the mayor going to change this program now? There are two ways he could have changed this program. One, he could have offered us refunds. Two, I don't know. I'm suggesting that that is financially prohibitive. I'll pay for it, then, because he can go and he could have done two things here. They could have, and I'm using the mayor loosely. It's actually the Board of Public Works and the City County Council. But he could have increased that monthly fee under the new program. They're actually, I mean, these sewer projects still cost the same. Have we ever decided an equal protection case on the basis that the State who had violated the Constitution can't afford to pay for it? Is there any case that supports that? No, Your Honor. It's just too expensive? No. And therefore, we have to deny equal protection? No, Your Honor. And I think that's what I'm saying. And so is what you're saying that when cities create tax policy, they can't think about the budget implications of that tax policy? No, Your Honor. What I'm saying is when they want to change tax policy, having already said these taxpayers are the same and entitled under law to equal treatment, they can't just say, well, it would be too expensive on us to treat them equally when unwinding that program. This Court in Plyler has said resources are not sufficient. And any tax case could be justified. If the city says, well, you know, we want to have, we want to refund X dollars to our taxpayers, but we only have enough to refund to the blonde people and not the brunettes, that's arbitrary, even if they couldn't afford to do it other ways, another way. So they can't just pick a method that's sort of where the math works out or is convenient and just say, well, that's the way we could have done it. I would, if I could just return to the practical ways they could have done this, and I think that highlights just how arbitrary this line was, they could have increased those monthly fees under STEP, the new program. I mean, that's how they paid for the rest of these projects. They're paying off the bonds of the old projects by charging everybody in Indianapolis $10 more a month. They could have just collected in our project. They could have collected for two more years. They could have said, you'll be forgiven, I think it's about 27 months. We're going to forgive your balances as of, you know, whatever that would be, June of 2010, whatever it would be, 2007. Collected that money, and then they would have had the cash to refund to the people who had paid an equal amount that they were forgiving to the others. So I think that's sort of, it's a red herring to say, gosh, we had no other way or we only had these options A, B, and C. I'd like to, I really want to just drill down on the illustration of just how crazy I think this is. Suppose that the United States decides tomorrow to go to a national sales tax instead of the Federal income tax. It's February 29th. Millions of people have paid their taxes for 2011. Many, many, most of us have not yet paid. Could the IRS come in and say, well, if you've already filed and paid your taxes for 2011, too bad. But lucky you, if you're a late filer, you're going to get your entire tax bill forgiven. I don't think that's remotely close. I think that is arbitrary, and I'll give you a couple of reasons. One, absolutely no notice. So the timing of payment, the method of payment that was selected gives those taxpayers absolutely no notice as to some constitutional significance that attaches to it. And I don't think, and I can tell you from talking to my clients, they don't, they didn't think that by paying up front in full that they had, they were somehow sacrificing their chance to equal treatment or that the city might someday wipe out 97 percent of their neighbor's tax obligations. Sotomayor's That is the parking amnesty example that you said wasn't the same. Because if an individual taxpayer has filed late, it's like the parking guy who didn't file his ticket either. So you really are saying that amnesty programs are out of the question. If the risk is imposed equally on everyone. No, Your Honor. In the parking ticket example, forgiving a penalty for late payment is a qualitatively different, to borrow from Enquist again, a subjectively individualized determination designed to achieve another goal, a legitimate goal in itself. Pay your parking ticket and we'll let the penalty go. That is different. So if my clients were here saying, well, you're not charging. No, but you're saying if you forgive the parking ticket, that's an equal protection violation. No, Your Honor. I mean, I would not, Your Honor. Again, it's context-driven. The parking ticket. Breyer. Well, the goal here is very simple. They say we have hundreds or dozens or 20 different programs anyway. And once we start getting into the business of distinguishing among people who are already paid up, it's going to be a nightmare. And so the only clear line we draw is between the people who are already paid up and the people who haven't paid. And we don't want those people who haven't paid to have to pay, because that's going to be another 20 years of administrating $33 a month. Okay. That's their rationale. Now, that may not be perfect, but it sounds reasonable, doesn't it? What's wrong with it? It's not, Your Honor. And I'll say it rests on the faulty premise. It's not their rationale or it's not perfect? It's not reasonable, Your Honor. It rests on the faulty premise that this is some administratively It's not impossible. It's not difficult. They don't say it's impossible. They say try looking through the U.S. tax code. It has thousands of pages. There is not one human being alive who understands every provision. All we have to do is start comparing the provision on page 1 with page 3, with page 7, page 9, and we will discover irrationality forever. So I don't – I mean, you may have a fairly simple case, but I foresee if you win, don't ask me what will happen, but I have a suspicion it's not going to be too good. Your Honor, I mean, there's one – there's somebody not here in this case that I think belies this notion that this is going to go against the tax code broadly or amnesty programs or forgiveness decisions generally. If – I think if people really thought that this case was going to foul up the tax code or forgiveness, I think the IRS would be here or the United States would be here saying, this is very similar to what we do on a daily basis in compromising debts on an individual basis. Was there an easier thing to administer than the system that was struck down in Allegheny-Pittsburgh? No, Your Honor. Whatever you paid, that's what your assessment was. And they argued, well, this is easy, that's enough. And this Court said no, it's an equal protection violation. Correct, Your Honor. And again, the administrative burden there was actually quite significant. You don't believe in the administrative nightmare exception to the Equal Protection Clause? Not when it only takes three pages. Can you tell me, I'm curious to know, if other States have provisions like the Barrett law and they're concerned about this, can they provide in the initial documents a promise that there will be no forgiveness, so that there would be a contract clause sort of argument against what happened here? In other words, and if we could explore that for just a minute, I'm going to ask, what it is that you thought constituted a promise in this case? Well, there are four or four separate. And maybe not a promise in the contract sense. Yes. Four separate provisions of the Barrett law. I'll just rattle them off for you. First, it says installment payments shall be collected in the same manner as other taxes. It actually says shall collect two other times. Requires a lien. It says that municipal officials who don't collect installment payments can actually be held personally liable and removed from office for failing to discharge their duties. That's on pages 2A to 3A of the appendix to the blue brief. So I don't think there's any sensible way to read the Barrett law as saying it doesn't require payment. And none of the State court judges who have looked at this have suggested that. On the other aspect of my case, do you think other States could provide protection against this in the event you do not prevail here and put in the documents that it is understood that a condition for your approving of this, these sewers will be that there will be no forgiveness? I suppose they could, Your Honor. Again, I'd argue that. Would that then be enforceable under the contract clause, you think? I'm not sure it would be under the contract clause. But could I flip it and suggest that if a State wanted to preserve its right to forgive willy-nilly, they could include a provision in their law that says, by the way, if you choose an installment plan and we change our policy, there shall be — you're not entitled to equal treatment with people who pay up front. To give you a warning. Right. And let's — we'll see who pays up front under that system. If I can, Your Honor, if you can, I'd like to reserve the remainder of my time. Thank you, Mr. Stancil. Mr. Clement. Thank you, Mr. Chief Justice, and may it please the Court. In 2005, the City of Indianapolis decided that it wanted to abandon its reliance on the Barrett Law, a program that had proved unpopular for financing public improvements. In doing so, they decided to make a clean break and forgive the outstanding balances that were due under the Barrett Law program. The alternative of maintaining those accounts and maintaining the tax liens associated with those accounts for nearly three decades was particularly unattractive. Now, the — Well, I think you've put your finger on the reason for this, which is that the city calculated that what it did would be more politically acceptable than treating the people who paid up front equally on an economic basis with the people who paid in installment plans. Now, if that's the reason for this, is that rational? Well, Justice Alito, it might well be rational. I mean, sometimes things that make policy sense that the public likes also make good government sense. And in this context, what they wanted to do is they wanted to get out of the Barrett Law business. That's the exact word — But what does that mean, they wanted to get out of the Barrett Law business? Can I put it very concretely? I mean, before this — you know, when they used to have the Barrett Law and used it on an ongoing basis within the Comptroller's office, they had a Barrett Law office. They wanted to get rid of the Barrett Law office. How do you get rid of the Barrett Law office? You get rid of the obligation to continue to collect these payments for 30 years. You get rid of the obligations to keep all these files together and see whether you're in a position to enforce a tax law. That really doesn't seem very complicated, to collect payments that people have agreed to pay. And if they didn't want to do it anymore, I bet they could have contracted that out for a very modest fee to any number of private entities that would have done it for them. Well, Justice Alito, of course they could have continued to collect. I think that's common ground here, which I think ultimately shows why this is a very to collect these, you know, for 30 years, then they agree there's no equal protection clause problem at all. Now, I think as Justice Kagan was suggesting, if you now create a rule that says when they do forgive, they actually have to provide refunds and face equal protection clause violations, then in the future nobody's going to ever forgive. What they're going to do in the future is even though they're trying to move away from this policy, even though they're trying to get out of the Barrett Law business, they're going to be stuck. So you — I think maybe if you prevail in this opinion, we should say the principle we are adopting in this case is don't trust the government. No, Justice Kennedy, I don't think that's right. But the fact that that's your reaction, I think, shows that this is not really an equal protection claim. And it's not really like Allegheny-Pittsburgh. Because as your colloquy with Mr. Stancil suggested, they would admit that if the government said as part of the Barrett Law, look, you know, we reserve the right to abandon the Barrett Law, and if we do so, you know, we may forgive installment payments. If they said that, the equal protection claim would go away in their view. Roberts. Well, that's simply because, as we said in Allegheny-Pittsburgh, the basis for considering the equal protection claim is the rights that you're given under State law. In Allegheny-Pittsburgh, it says you have the right to be treated equally with respect to assessments, and you weren't. Here the law says you have the right to be treated equally or whatever it is, the proportionment, and they weren't. All that you're saying there is that State law gets to set the base. And if the State law says we don't treat people the same in extending sewer hookups, then that takes away your equal protection clause. But it just sets the base. Two differences, Mr. Chief Justice. First of all, you know, there's no real analog to Allegheny-Pittsburgh because Allegheny-Pittsburgh is a one-time-in-time case. There the problem was that statute was very different. It was facially neutral. And it was being applied in an unequal way. Nothing, not one word in Allegheny-Pittsburgh suggests that if the State of West Virginia wanted to change its policy and adopt Proposition 13 as the law of West Virginia, that it couldn't do so. And that's the anomaly here. This equal treatment requirement they get, they get it from the Barrett law. That's the exact law that they get. The change in policy is from treating people equally to treating people unequally. I don't see how the fact that they're changing that policy addresses the issue at all. They're going from a system where everybody was subject to the same assessment to a system where some pay something and other people pay 30 times that. Yes, it's a change, but it's the change that presents the problem. No, with respect, I think it's the change that makes this case different from Allegheny-Pittsburgh. It's the change that makes this government action rational. This would be a different case if they didn't change the Barrett law program. They just stuck by it and said, you know, we're going to forgive some people. But here they decide they're going to abandon the very law that imposes supposedly – I want to talk about what State law really does – but supposedly imposes this equal protection requirement. That's the very law they want to move away from. And this idea that Alito Other than political expediency and administrative convenience, I still don't understand what rational basis you claim there was for the distinction that was drawn. Now, maybe one of those is sufficient, but other than those two possible bases, I don't see another one. Well, you know, I count five, Justice Alito, if you want to hear – I mean, I'll go through them. One is what I call making a clean break, having not to deal with the vestiges of the old program. You may call it political expedience. I don't think it is. I think that's, you know, a good government concern. The second is avoiding the administrative burdens of particularly the refund process. And I think it's worth recognizing that, you know, they say, well, what could be simpler? Just cut a check. But to whom? And for what amount? I mean, you know, if you're going to go back to closed accounts, the first thing you're going to have to confront is, what do we do with the people that have sold their house? Well, I mean, you know, we've got to figure out where they are now. We've got to figure out, I mean — Those are reasons for not giving refunds. But what are the reasons for forgiving the debt that people agreed to? Well, okay. But if I could, they don't challenge the forgiveness. So the reason that I'm trying to explain that there are rational bases for not giving refunds is because the challenge that's really brought here is to Resolution 101, and it's forgiveness without refund. But you don't dispute that the City would have that option if we ruled against you? Would have the option what, Mr. Justice Kennedy? Just not to forgive the unpaid balances. The City has the option, I assume. They certainly have the option in the future. I think it's a dispute between the parties whether they have the option as a part of the remedy. I would say, not to get ahead of myself, but to address the remedy, this is very different from Allegheny-Pittsburgh. And it has to be that one option is to simply invalidate Resolution 101. I'm not aware of any other area of the law where you can have a statute or an ordinance that draws an invalid distinction, and one remedial option is not to invalidate the statute or the ordinance. And that's the position. Their position is, you know, if you would have put something in there that said we're not going to do anything, you'd be fine. But having given forgiveness and said we're not going to give refunds, you're stuck not only with the forgiveness, but also with the agreement. So there's a big difference. In one case, there's an expectation. In the other case, there isn't. No, Mr. Justice Kennedy, because the expectation here is at the time of Resolution 101. At the time of Resolution 101, I think it's common ground. The city was under no obligation to provide forgiveness. So if in 101, by providing forgiveness without refunds, they violated the Equal Protection Clause, why isn't the logical remedy for that to simply invalidate Resolution  101? Because you would eliminate all litigation on Equal Protection Clause grounds if all that the plaintiff is going to achieve is not any benefit to him, but harming somebody else. The classic case is the sex discrimination case, where a State had a drinking law, which said that men could drink at the age of 18, but women at the age of 21. And what happened in the lawsuit? Did the Court say, well, I guess men will be able to drink at 18? No, that's the question. No, I think they said. They said men would have to drink at 18, not that women will have to wait to 21. No, I think they said it could go either way. Exactly. It was up to the Oklahoma legislature. They could make it 21 for everyone or 18 for everyone. And the city retains that option in this case going forward. The problem with your analogy is you're dealing with a situation. You're saying, well, here's a violation and the law can — and what does the law do? The tithe is exactly 180 degrees away. There's no violation and the law creates the violation. In that situation, I think you're dealing with an entirely different case. If the law that created the violation is Resolution 101, then the remedy in every other area of constitutional law, including sex discrimination, is clearly that the State has the option. They can level up or they can level down. The only case that's different is Allegheny-Pittsburgh and the assessment cases it relies on. But there's an important difference. Then you're saying that the difference between the two classes is that if you continue to have the tax apply to the people who haven't paid it yet, there is a large administrative expense. And if you — an expense that does not exist in respect to the class that's already paid it. So the question I would have thought in our court is whether that's a rational distinction. And I think contrary to what was suggested, administrative expenses of course make a difference where the Equal Protection Clause is concerned, because they differentiate between the two classes and trying to avoid an administrative expense is a rational reason normally for making the distinction. Now, I mention that because I know — what it can — does that bring to mind any authority which would be helpful? Because there was a question that there is no such authority. It makes sense to me, but is there some authority for that? Sure there is, Your Honor. I mean, if you look to a number of places, I would look to Carmichael v. Southern Coal, where, you know, this Court is confronting a case where the State says, you know, we're not going to tax employers, employers who are smaller than 8, because you know the game's not worth the candle. And in a similar way here, they say, we want to get out of the Barrett Law business. We want to make a clean break. And they say, you know, we don't want to keep this office in the Comptroller's office. But here — here the State has defined the class. That's the difference. I mean, to say employers with less than 8 is a separate class, that's fine. But — but here the State said, we're creating this class of — of people who have to pay for sewer assessments, and we're going to treat them equally. That's what the law required. I would have thought, Justice Scalia, if this was an equal protection case, not a contracts case, not a Winstar case, not an Estoppel case, if this was an equal protection case, the relevant time period would be the time period of the ordinance that's challenged, Resolution 101. At that time, there is a difference already in real world fact between those who have an equal and those who have outstanding balances and are going to keep the city in the Barrett Law business for three decades. So you're saying that any future law which — which disregards an equal classification that a prior law established is okay, so long as it's a future law that does it? Well, it will always be a future law that does it. No, it could be. There still has to be a rational basis for it. Yes. And — and — That's what we're questioning. Right. But a rational basis is, boy, you know, we have two sets of accounts. Half of these accounts are going to be a nightmare to maintain. We have an estimate from our comptroller. This is in the Cox litigation, but it's cited in one of the amicus briefs. We got an estimate from our comptroller that's going to cost us $200,000 to upgrade and maintain this system. We really don't want to spend that. Now, is that $200,000 associated? Well, but I think I don't see the answer — excuse me. I don't see the answer to Justice Scalia's question. You're saying this would be a rational system going forward, but you also promised the people that they would be treated equally over a certain period. When you start out, it's not equal, because somebody pays $400 and somebody else pays $10,000. And — but over the 30-year period, it's the same. That's why it's equal in the beginning, even though somebody pays $400 and somebody pays $10,000, because they're going to pay the same over the period. Then you lop off the period. So you're not treating them equally when you start it. You can no longer say, don't worry about the inequality. It will sort out in 30 years. Now you can't — you have no way of telling them why it's not unequal. With all due respect, Mr. Chief Justice, you're making this sound like it's an estoppel case, like it's a wind star case. It's not a broken promise case. This is an equal protection case. And the reason there's a rational difference at the time resolution 101 is, is because that point, time has passed and they're in a different position. But I also do want to make clear that you will look in vain in the Barrett law for this stern promise that no matter what happens, we will eventually collect the same amount from everybody. What there is, is there is a requirement for equal assessment in the first instance. Nobody says that was violated. And then if you elect for installments, there's a provision that says you shall collect. The irony of their position is they say it's perfectly okay for the city to break that promise. It's perfectly okay to give forgiveness. They don't have a quorum — a quarrel with forgiveness. They want forgiveness. They just want to get some refunds, too, as a result. Well, they want forgiveness. But you outlined correctly in your brief the fact that the city had three options. One of the options was to hold everybody to what they understood when they signed up under the Barrett law. And I — I do not understand how your administrative convenience argument fits in with the decision to forgive the debt of the people who agreed to pay on the installment plan. When the city was collecting those payments, was that a net loss? Were the administrative costs of making those collections more than the amount of money that was brought in? If not, then I don't see how administrative convenience justifies the rejection of that option. Justice Alito, as I hear you, you've switched from rational basis to it has to be, you know, a net — unless we can show a net loss, we lose. Why can't we make a rational judgment that there's a unique $200,000 cost associated with maintaining this program? We don't want to maintain the program. It's tremendously politically unpopular. We've moved away from it. We don't want to — I mean, can you imagine the city — It's rational for a city to say that it costs us $100,000 to collect this money, and if we do collect it, we're going to bring in $500,000, so we don't want to pay the $100,000, so we're going to get rid of the program. That's rational? It is rational, Justice Alito, because they have to maintain an office to do it. You know, think about the city. Do you really think — If the net — if the net cost — if it's a net gain, what is the rationality of abandoning it? Because they want to get rid of the office. They want to get out of the business. They want to make a clean break. Can you imagine the city 27 years from now trying to take somebody's home by imposing and trying to enforce a tax lien based on a program that they walked away from 27 years earlier? They'd get laughed at. They couldn't do that. And if they can make that judgment in — another way of thinking about it, 10 years from now, okay, they've collected everything from the 10-year payers. All they've got left are the 20-year payers, the 30-year payers. They say, you know, this is ridiculous. We're still taking in more money than it would cost, but it's ridiculous. We want to get out of this business. We've told them — You've put your finger on it. They want to get out of the business. What they've done is to shift the cost of the sewers from a small group, a small interest group that is able to presumably exert some political power to everybody. They spread the cost around to everybody, and everybody — the ordinary person who has to pay a little bit more every month doesn't get all fired up about it. That's what this — that's what this is about, isn't it? No, it's not what it's about. The way you're describing it, maybe there's a takings claim for somebody to bring, but it's not an equal protection claim. What you just articulated would be exactly the same if there were a provision in the Barrett Law that said, by the way, if we ever get rid of the Barrett Law, all bets are off. We might be glad. Well, there is a provision. You said I'd search in vain for this provision in the Barrett Law. Yes. Well, I went and searched, and 15 — 15b3 says the cost shall be primarily apportioned equally among all abutting lands or lots. Yes. That's the — that's the provision I already mentioned about appraisals. That's talking about the cost. It says costs. The cost of the project, when they are doing the appraisal, when they're coming up with the cost or how much it's going to cost to stick the pipes in the ground,  That's an assessment. There's a specific provision that you can challenge the assessment if you don't like it. Once you don't challenge it, it's final. There's actually two provisions in the Barrett Law that you won't search in vain for that talk about the interest of finality, which is yet another reason that justifies the differential treatment here between people who have paid in full, their accounts are closed, and people who have ongoing outstanding balances. Where do I look to find that when they say the costs shall be apportioned equally, they're not referring to the costs, but they're referring to the assessments? They're referring to the costs of the project, the improvement, that will then be reflected The costs of the project are funded by the sewer hookups, and some people pay $400,000 and some people pay $10,000. No, but it's the costs that are then reflected in the assessment on each lot. And there's then a process for challenging that assessment on the assumption that the costs are allocated equally to each lot, and then when that's done, the finality provisions kick in. And nobody says there was anything wrong. Kennedy That just underscores the promise of the State or the city that all owners will be treated equally. That just underscores the point that that was the understanding and the commitment. Clement With respect, that's not. The original idea is, sure, you know, we're going to assess the costs of the project equally among everybody who's benefiting from the project. And then we're going to have an assessment, and if the Barrett Law doesn't change, the assumption is everybody's going to pay the same amount. I'm not here to tell you otherwise. But the point is, the Barrett Law, like most laws, doesn't have a clause that plans for its own demise. It doesn't say, well, you know, if we get rid of this law, we either will or will not enforce the installments. And I think the question here is, at a different point in time, when they've made a different judgment, we don't like the Barrett Law, it's proven unpopular, it's proven unwieldy. It's not just popularity or political, it's that, you know, they're facing lots of low-income subdivisions with septic tanks, and, you know, they're forcing the prospect of trying to get people to pay $10,000 to improve the sewer on a house that's worth $50,000. They realize that's a nonstarter. We've got to get out of this business. Roberts. You just said it's not popularity. In page 1 of your brief, you say the Barrett Law method eventually proved to be politically unpopular. Sounds like it's popularity to me. It's not just popularity. You know, every once in a while, the people have a point. And it's not just that they don't like something, it's their right to not like it. And they're very much right to not like a law that says you get a $50,000 house and we're going to make you pay for a $10,000 sewer hookup. They were right to get out of the business. Having done that, I don't understand why they're saddled with a provision of law that exists in the old law that they're trying to get away from. And just to be clear, I mean, if you want to look at a case that I think shows you why the State law is not as equality uber alice as they're presenting, take a look at an old Indiana case called Allendorf, 176 Northeast 240. That's a case where some people in the project challenged the assessment, said, you know, that's unfair, it's too much. Other people paid in full. The people who challenged it went to court. They eventually settled with the city for a reduced amount. Then later on, the people who had paid in full went into court and said he were entitled to pay no more than those guys. You know what the Indiana appellate court said? No dice. That doesn't work. You basically, you either waived your right in an express waiver or if you paid in full, it's too late. It's too late. And this is, with respect, I think part of the problem with the Allegheny-Pittsburgh and particularly this extension of it, you're putting so much weight on the State law, and it gets you in this business of flyspecking the Barrett law. I mean, Justice Thomas made this point very well in the Nordlinger case, that there's an anomaly here, which is you're supposed to be looking at Federal law, and the violation seems to be tied to potentially a violation of State law. If I could focus on that for a minute, because this is another really important difference between Allegheny-Pittsburgh and this case, which speaks right to the remedy. In Allegheny-Pittsburgh, it's a facially neutral statute. And so it would be an anomaly there to say that when there's a facially neutral statute, you're going to invalidate the statute. The statute's fine. The problem is you've been assessed at 100 percent. Everybody else has been assessed at 50 percent. The Court in that unique context says, you know, there's no obligation to go and sort of mandamus the assessor to bring everybody else up. You get to sort of go back to that level. This is very different. The challenge here, like in Nordlinger, is a challenge to a distinction drawn in a law. Resolution 101, unlike the law in Allegheny-Pittsburgh, is not facially neutral. It draws a distinction. So the relevant question is the rationality of that distinction. Is it rational? We submit there are multiple reasons why it is rational. But if you disagree with me, the obvious remedy is to strike down the statute or at least remand to the State court with express instructions that they have the option, which is exactly what happened in the sex discrimination cases. And, Justice Scalia, if you're worried about incentives and standing, look at Heckler v. Matthews, another sex discrimination case. This exact issue came up. And what the Court said is standing is based on your right to guarantee equal treatment. Whether or not it's a pocketbook injury, you have standing if you're denied equal treatment. Now, these guys may have been denied equal treatment on the assumption they're right, but they can get equal treatment restored just as easily by Resolution 101 being invalidated in full as they can by getting an additional windfall by getting a refund. And it's not really an option. Kennedy. Well, why is that a big deal for us? I mean, that's the law. You get your choice. Okay. But, I mean, that's a big difference, because that's different from what they're saying. They're saying there's no remedial option. They're saying we are stuck now. We have to give refunds. That's the only permissible constitutional remedy. And, obviously, the City would prefer to get out of the Barrett law business and provide these forgiveness, but it would certainly be a lot better for the City if they would at least, as the Court made clear, they had the option of leveling up or leveling down. I do think, though, that gets suggested.  Well, if I could, you mentioned Heckler v. Matthews. In Heckler v. Matthews, the Court said, quote, ''Ordinarily, extension of the withheld benefit rather than nullification is the proper course.'' So while it is true that you can cure a violation by leveling up or leveling down, ordinarily, extension of the benefit is the proper course. And that's for the reason Justice Scalia gave, because otherwise there would be no equal protection case brought. If that were the rule, Heckler v. Matthews would have come out the other way. The Court was, you know, the Court was Well, what wrong, what did the Court mean when they said, ordinarily, extension is the proper course? Well, they were talking about a specific situation, A, under Federal law. So I don't know why the rule would be the same. And the sex discrimination cases are much more on point for purposes of this. But they're also talking about a very specific context where you have a limitation on a benefit. And the idea is if you strike down the limitation, the default option is everybody gets the benefit. This is different. I mean, really what Heckler is talking about is severability concerns. There's no severability that works here. Resolution 101, if you look at it, doesn't say anything about refunds. It simply says we're going to forgive the balances on the outstanding accounts. If that's somehow impermissible, then the law goes. There's nothing to sever. There's not one word in the statute about refunds. And that's different from the context where you have a general extension of benefits and you have some limitation. Breyer. What do you think would happen if the city says, if it came out that way, we really want to give refunds, or cut them off, we want to stop collecting the money, period. Then to make it fair on this hypothesis, the city would have to go back and refund money. To whom? And how many? And how do you heard your friend try to make a distinction between this project and you wouldn't have to give the money, he said, to every other person who ever back in 1850 or 1890 or whenever it was began to make Barrett law payments. But you would with this one. Now, I'd like a little comment on that. Well, you're absolutely right. And, you know, I talked about the question. Right, because it's a question. Well, okay. Then the answer is it would be an administrative nightmare, if I understand the question. I don't understand that. Why? I mean, people paid the lump sum. If people come forward and say, I'm one of the ones who paid the lump sum, I want a refund. And if somebody doesn't come and present such a claim, the city doesn't pay. If someone does, surely the city has records. Let me try to get my question, which is, I'm not — I'm thinking this is Project 1. So certainly on the hypothesis, you have to pay back the people who already paid up for Project 1. But in your brief, you say there's Project 2 through 20. And is there, in your opinion, a basis for distinguishing all those people who have paid up in those projects, or would you have to give them their money back, too? Now, you heard your friend's statement and explanation of why you wouldn't have to give them the money back, and I want to get your response to that. Well, with respect, what I heard him say is we probably would. And I think we certainly would as to most of the projects. There might be a couple of the projects where the differences are so small that he would say there's no gross inequality there. But as to most of the other projects, there are still substantial differences. How many people does that involve about? It involves — you know, I don't — I know the number of projects. Rough. It's like 20 projects. So I'm guessing it's at least 1,000 people. And then, of course, somebody is going to come in if we do that, as you suggested, and say, wait a second. Was his figure of 2 million accurate? Has the State done it in the other case? The stakes in the other case without interest, I think, are $2.7 million. So, you know, I think the ballpark figures are right. When you say the other case, you mean every other project, because that's a — that's what a class action, right? It's a class action that cops the Federal litigation. But still, that's not an insubstantial amount. Of course, the relevant question is not, you know, are the damages a set figure after you've had litigation in Federal court? The question is, what does the City Administrator at the time he's trying to decide whether he has a refund obligation to do? And, Justice Scalia, you said, well, it's clear it's mud. I mean, did you listen to the answer about gross inequality? What, are they supposed to run it through the gross inequality calculator that tells them, well, you know, it's close, but it's not really — there's not a discrete obligation? I don't know how — I would not know how to advise them as to which of the other 21 projects they owed a refund to and which they didn't. I would be at a complete loss. And the reason — If everybody — if everybody entitled to a refund came forward, it would cost you $2.7 million. And if you — No, actually, it would — plus this one, so it would be a little over 3. Okay. 3. $3 million. And you say the real problem is the huge administrative cost in trying to figure out who you owe it to. If it's that huge, all they do is somebody who comes forward, asks for a refund, verify that they're, you know, were a homeowner in the project, give them the refund. The most it's going to cost is $3 million. Yeah. In this case, and the law that you develop here is not going to be limited to this case. It's going to apply in other contexts as well. Heaven knows where it stops. As I said, Allegheny-Pittsburgh, it was at least limited to a particular context. Now, I mean, I don't know why any city ever — I mean, maybe this is the limiting principle, but no city ever again will provide amnesty or forgiveness under any sort of — Amnesty. I don't get — amnesty is entirely different. Amnesty is for people who did something wrong. Nobody did something wrong here. It wasn't wrong to pay with installments. So the amnesty cases don't apply. It's the same principle. I mean, I could certainly see some — you know, suppose a city elects a laissez-faire mayor and says, you know what, parking tickets, it's not worth the hassle, we're going to get out of the parking ticket enforcement business, and we're going to forgive everybody their parking tickets. If I just paid my parking tickets, I'd be hacked off. But I wouldn't feel like I had a Federal constitutional right to get my money back. And that's the difficulty. Do you have a hypothetical about the income tax and the sales tax, so you don't pay any income tax if the sales tax has gone into effect? I think if they really got rid of the Federal tax forever, I don't think there would be an equal protection violation. I think there might be a different constitutional violation. If you listen to him, the first thing he ticked off about why that would be so horrible is there was no notice. Well, that sounds like a due process concern to me, not an equal protection concern. And that's really what's happening here when they transport Allegheny-Pittsburgh from the context that arose in to this very different context. They're converting it from an equal protection case to something more like a contract clause case or to a wind star case or something like that. And not one word in that opinion suggests that once a State adopts a certain policy that it's trapped. It can't make a reasonable and rational transition away from that policy to a policy that better serves the citizenry. And if it doesn't? Is there some identified or identifiable demographic difference between the two groups that either justifies or could on a remand justify the different treatment? Well, I think the one ‑‑ I don't think there's a demographic difference. I think the one concrete difference that really is a difference is from the city's perspective, they're looking at two groups, all of whom are going to have to pay a new, higher monthly fee. And I think they can make a rational decision that says, look, you know, one of these groups has to make two monthly payments to the city for sewer and water. That seems a little crazy. So why are we ‑‑ what we'll do is we'll just make everybody in the city, in terms of their ongoing payments to the city for sewer and water, we'll treat them all exactly the same, one fee. Thank you. Thank you, counsel. Mr. Stancil, you have 4 minutes remaining. Justice Alito, I want to just pick up right there. What they're actually saying on these two monthly payments idea is that it's rational for somebody who's just paid $300 and now everybody pays an extra $10 a month. We don't want them to have to make their $30-a-month Barrett law payment, having paid $300 and the extra $10. My clients still have to pay the extra $10 a month, but we're out of pocket $9,300. I think that is ‑‑ I think that's patently irrational to say that we're trying to help people who are out $300 from having to pay an extra $30 a month going forward. Mr. Stancil, here's what worries me about this case. To me, this is a case about transition rules. All legislation creates classes of citizens and some are in ‑‑ and puts them all in a group and says you're going to be treated in the same way as long as this legislation exists. And then a legislature comes along and changes that piece of legislation. And different people are affected differently by it. And to me, what you're suggesting is that when that break is made and when that transition occurs, the ‑‑ I don't know how you would apply the rule that you're suggesting, which is that everybody in the former class has to be treated the same as a matter of transition policy. If you've promised equal treatment, and we're talking about a ‑‑ this is a specific case, a specific, commonly shared benefit among people who are indistinguishable on any rational basis, they live next door to each other, they flush into the same pipe, and they paid and were promised equal payments, in that instance, you ‑‑ then there has to be a rational method. You have to treat them equally when you transition. So there may be times where the city has promised and committed, and there is no independent rational basis for distinguishing. It's not that if we want to go forward and we want to tax blondes instead of brunettes, well, the fact that we're going to start doing that prospectively doesn't make that okay. And moreover, this isn't prospective. We're talking about an assessment historically imposed on the very same day for the very same. But time is usually a rational reason for doing it. Suppose everybody paid on the installment plan. The city could say, as of a certain date, we're forgiven, no more installment payments. And the people who paid up previously, would they be ‑‑ would they have an equal protection claim? If we ‑‑ I'm sorry. I suppose that there had never been the option of making the lump sum payment. Everybody paid on installment plans over a 10‑year period, and then the city decided January 1, 2012, no more installment payments. Everything that's still due is forgiven. That would be rational, wouldn't it? Right. Because we'd all be treated equally. Could I quickly get to the administrative nightmare? If you go to the Cox litigation and go on Pacer and you pull up document number 98, you'll find the city's filing in the Cox case, in which they give the name and address and amount of owe to every taxpayer under any of these 20 other Barrett law projects. This is ‑‑ I think it's ludicrous to say that there's some Gordian knot that would have to be cut to issue refunds. But more generally, I think this is part of the city's argument. They say, well, perfection may be difficult to achieve. Well, so be it. It always is. But that does not justify gross disparities in anything goes. You may want to make a clean break and go to a new system. Fine. But you have to do it in a way that treats the same. The argument isn't that it's expensive to administer as much as it is there are a thousand people in all these projects who are already paid up. We don't have enough money to pay them all back. That's why we don't want to pay them back. At the same time, we don't want to collect the money for 30 years from these other people who aren't fully paid yet. The question, I guess, is, is that rational? No, Your Honor. Simply sending in your tax bill, again, if you sent in your taxes yesterday, are you too bad, so sad? I don't think that's rational. And I want to get back to the reliance interest, because ‑‑ Thank you, counsel. The case is submitted.